. This honorable appellate clerk for the second district is now open. The honorable justice Susan F. Hutchinson presiding along with justice Anne B. Jorgensen and justice Mary S. Schaffer. The case is number 219-0372. People of the state of Illinois plaintiff appellate v. Grant W. Gambaiani defendant appellant. Arguing for the appellant Nicholas Curran. Arguing for the appellate Kristen M. Schwinn. Good morning, counsel. Thank you for joining us in this particular medium for oral argument today. And I am the one who will be pulling the hook in the event that you don't hear the buzzer. But you have the time that's been indicated. And Mr. Curran, if you are ready, you may proceed. Thank you, your honor. And may it please the court. As mentioned, my name is Nicholas Curran. I represent the defendant appellant Grant Gambaiani. This appeal is from the denial of Mr. Gambaiani's post conviction petition after a third stage hearing. And the primary issue to be resolved by this court is whether the circuit court's denial of the petition was manifestly erroneous. So just by way of brief background, Mr. Gambaiani was initially charged with four counts of predatory criminal sexual assault of a child, one count of aggravated criminal sexual abuse and one count of child pornography. Before his first trial, the state extended an offer to Mr. Gambaiani to enter a blind plea to a class one felony with a sentencing range of four to 15 years. Mr. Gambaiani alleged in his post conviction petition that his trial attorneys did not tell him before he rejected the offer that he was subject to mandatory consecutive sentencing on the four class X felonies with which he was charged. And he alleged that had he been told he was subject to mandatory consecutive sentencing, he would have accepted the state's offer. Ultimately, Mr. Gambaiani was tried twice. His first trial was reversed by this court on direct appeal. After his second trial, he was ultimately sentenced to a term of 34 years, obviously a term of imprisonment much longer than the highest sentence he could have received under the terms of the state's plea offer. Here, the circuit court denied the petition after a third stage hearing, making two findings that are two that Mr. Gambaiani rejected the offer because he was unreceptive to any disposition that involved the penitentiary penitentiary. Both of those credibility findings are against the manifest weight of the evidence presented at the third stage hearing. Turning first to the circuit court's ruling that Mr. Gambaiani's attorneys told him that he was subject to mandatory consecutive sentencing. This case is unique in that Mr. Gambaiani's attorneys documented the fact that they gave him the wrong advice. So the state's offer was conveyed to Mr. Gambaiani on July 16, 2009 at a meeting at his attorney's office. And almost five months later, one of the defense attorneys, Kevin Halverson, prepared a memo documenting the advice that he claimed he gave Mr. Gambaiani with regard to the plea. And Mr. Halverson at the third stage hearing testified that he drafted the memo with precision to memorialize exactly what it was he told Mr. Gambaiani about the plea. In fact, he testified that the purpose for drafting the memo was to document the advice he gave to Mr. Gambaiani because he felt that Mr. Gambaiani should have accepted the state's offer. But the memo shows that Mr. Halverson and his co-counsel gave Mr. Gambaiani the wrong advice. The memo stated with regard to the class X felonies, Mr. Gambaiani was told that they could be served consecutively and that if he were to be found guilty of two class X felonies and if they were to be served consecutively, that he would be serving 12 years at 85%. The memo for the court's reference is at pages 111 and 112 of the appendix to Mr. Gambaiani's brief. So even if you accept that this memo shows what Mr. Gambaiani was told, it shows that he was given the wrong advice. He was not told that he was subject to mandatory consecutive sentencing for each conviction of a class X felony. Rather, he was told that consecutive sentencing was a possibility. When the circuit court issued its ruling, it suggested that the difference between would or could was a matter of semantics. But that ruling is manifestly incorrect. Would and could do not have the same technical meaning. Could is used to indicate a possibility. So when an attorney says that if you could be subject to consecutive sentencing, the attorney is telling you that you might be subject to consecutive sentencing, not that consecutive sentencing is mandatory. And this is the starting point for Mr. Gambaiani's argument that the circuit court's ruling was against the manifest weight of the evidence. Even if you credit that memo, the memo shows that the wrong advice was given to Mr. Gambaiani, which in turn mandates the conclusion that his attorney's performance in connection with the plea deal was deficient. The circuit court's ruling that Mr. Gambaiani's attorneys credibly testified that they told him he was not subject to consecutive sentencing was in line with the objective evidence that was introduced at the hearing. Mr. Gambaiani was represented by two attorneys at trial, at his first trial. Elliot Samuels and Kevin Halverson. Mr. Samuels' testimony at the third stage hearing was all over the map. He testified that he could not remember trying to obtain a resolution to the case that involved a term of probation. But there was objective evidence introduced over and over again that showed that, in fact, he had tried to secure a disposition to these charges that involved a plea to a probationable offense. Mr. Samuels denied submitting a mitigation proposal requesting that Mr. Gambaiani have the opportunity to plead to a probationable offense. Yet there's a mitigation proposal that was entered into evidence that showed that he made that exact request. I think probably one of the most telling things about Mr. Samuels' credibility is, you know, during direct examination, he initially testified that he did not give Mr. Gambaiani any advice as to whether he should accept the state's offer. But then on cross-examination, he did a complete 180 and testified that he recommended that Mr. Gambaiani accept the offer. He testified that his reason for doing so was, at that point, a superseding indictment. He testified that there was no way under the sun that Mr. Gambaiani would be acquitted. The problem with his vivid recall on that is that the superseding indictment was not issued until after this plea offer was rejected. And moreover, there was a motion to sever the pornography counts, and the court did not rule that or deny that motion and ruled that the jury would see all of that evidence until March of 2010, which, again, is long after the plea deal was rejected. So in other words, Mr. Samuels' testimony on this point was demonstrably false and contradicted by the record. You know, Mr. Halverson's testimony was also suggesting that the memo shows that he told Mr. Gambaiani that he was subject to mandatory consecutive sentencing, when, of course, that's not what the memo says. But then he also testified or gave conflicting testimony with Mr. Samuels regarding why this memo was created in the first place. He testified that it was Mr. Samuels' idea to create the memo because the feeling was that this was an offer that Mr. Gambaiani should have accepted. Mr. Samuels testified that it was Mr. Halverson's experience as a prosecutor that prompted Mr. Halverson to create the memo. So their testimony was very much in line with Mr. Gambaiani's testimony. But I think one of the most important things here is, you know, if you look at this case, if you look at the strength of the evidence and you look at the offer that was extended to the defendant, this was a very good offer. And I think all the parties agreed to that at the third stage hearing. Very favorable for the defendant. And he rejected it. And any defense attorney is going to contemporaneously document the fact that they gave the defendant the advice that they should receive or they should accept the offer, listing out the reasons why they gave that advice and the fact that the defendant nevertheless rejected the offer. It's kind of like if a patient at a hospital leaves against medical advice. That's something that's documented all over their chart. Here, neither Mr. Halverson nor Mr. Samuels documented the fact contemporaneously that they gave Mr. Gambaiani advice that he should accept this offer and that he rejected it despite their advice. In fact, Mr. Samuels had handwritten notes from the meeting with Mr. Gambiani during which this plea offer was discussed and there's nothing in his notes about the advice that Mr. Gambiani was given. So, you know, it's difficult in this kind of forum to point out all the ways in which their testimony just either was implausible, didn't make sense, was inconsistent. But if you really look at it, the great weight of the evidence here is that their testimony was simply not credible. Very briefly, as to the second credibility finding the court made, it held that Mr. Gambiani rejected the state's offer because he was unresponsive to any disposition that did not involve the penitentiary. Well, that's just not true. After Mr. Gambiani was convicted, he told his second attorney, his subsequent attorney, that he was willing to accept an offer of 20 years, which was even longer than the maximum term of incarceration he would have received pursuant to the state's prior offer. And that's not something Mr. Gambiani testified to, but that's something his subsequent attorney testified to and, in fact, had documented in a letter to Mr. Gambiani and his father. So what changed is that between his rejection of the offer the first time around and his willingness to accept an offer of 20 years was that he learned he was subject to mandatory consecutive sentencing after his first trial. The final point we make in our brief is that here the circuit court judge improperly relied on his own experience as a prosecutor and defense attorney in finding that it was not a hard sell that Mr. Gambiani was unreceptive to a disposition that involved prison time. As we point out in our brief, it was improper for the court to rely on that experience to make a credibility finding because it was untested by cross-examination. It was not subject to the rules of evidence. It's not the kind of knowledge that a layperson would possess or that a juror would possess that's common to everyone. He was relying on his specific experience and observations, having been in the field of criminal defense and then drew a comparison between his prior clients and Mr. Gambiani and that was, I would submit, inappropriate. So I will rest on that argument unless the court has any questions for me. Thank you, Mr. Curran. Justice Jorgensen, do you have any questions? I do. Counsel, you suggested a note or a portion of the memo regarding Class X offenses. You could be sentenced to consecutive sentencing. Could you be sentenced to consecutive For example, if you were convicted of 2, it would be a minimum of 6 times 2 is 12 times .85. Was that an example of what counsel was explaining? So it was a hypothetical. I think if you look at the memo, the language used there is not ambiguous. The attorney was pointing out a hypothetical in which consecutive sentencing was a possibility, not that it was mandatory. And so if the court ordered consecutive sentencing, this would be the result, 12 years at 85%. Again, words matter and would and could have very different meanings in this context. The fact that someone might be subject to permissive consecutive sentencing is very different from mandatory consecutive sentencing. But the question is, was that an example or was counsel saying this is what would happen in your case? Yeah, I think if you look at the context of that part of the memo, he is giving an example of what might happen. So the memo indicates if they are served consecutively, and if you are sentenced 6 years on both consecutively, then you would serve 12 years at 85%. And you suggested that the defendant here would have accepted some time in the penitentiary. Is that your position? Correct. And that is based on after having received 34 years and been convicted a second time, he was willing to take 20? No, Your Honor. To clarify that point, after he was first convicted, when it came back, he retained a second or I guess a third attorney. Yes. And so it was after he retained his third attorney before his second trial. There were further plea negotiations, and the defendant told his third attorney, Steven Brundage, that he was willing to accept a plea offer that involved a term of incarceration of up to 20 years. Right. But here's my point. Isn't it somewhat disingenuous to say, hey, I got convicted the first time I got 34 years, so now I'm willing to take 20? How does that relate back to prior to the first trial where he is adamant that he will not go to jail because the victim's family, which is his family, wants him to get treatment. They don't want him to have to go to jail. How do we balance those two? Well, Your Honor, I would dispute that Mr. Gambiani was unreceptive or adamant about not wanting to go to prison. That's entirely a product of Mr. Halverson and Mr. Samuel's testimony. So you have to credit their testimony to make that finding, first and foremost. And for all the reasons we lay out in our brief, the notion here that the defendant is the only one who has an interest in testifying a certain way, it's simply not. That's not valid. No defense attorney wants to be called ineffective. And so when their performance is being challenged... But here's the point of the question. Is there anything that indicates that prior to the first trial that your client was willing to take time in the penitentiary? Well, I think that... Could it be a yes or a no? And if it's a yes, point to the record. Sure. So the answer is there's nothing in writing that would point to his willingness to accept time in the penitentiary prior to his rejection of the first plea deal. However, that's what he testified to at the third stage hearing. And I think part of what your honors question alludes to is this idea that there has to be corroborative evidence of the defendant's willingness to accept the plea or prejudice. I guess there has to be corroborative evidence to the prejudice prong in order for the defendant to prevail. One of the things you can look at, though, is the disparity between the sentence he was facing and what was offered under the terms of the proposed plea. And here there's a vast difference between what Mr. Gambiani... Counsel, I agree with you. There is no explanation for why he did not take this offer. None. Except that his dad, I believe it was, who testified that there would be a better offer coming down the pike. You know, sort of on the steps of the courthouse, the state will make you a better offer. Well, I think that... I mean, do I discount that as not influencing the defendant here? I think that's... You know, your honor, I think that that's... You're fairly alluding to what their mindset was, but the question here is not necessarily why he rejected the offer. It's what he would have done had he received the correct advice. So their mindset, and in our contention is, the defendant's mindset would have been completely different had he told, look, if you're convicted of these four class X felonies, for which the evidence is almost overwhelming, you are going to, at a minimum, mandatorily serve 24 years at 85%. What he would have done had he been given that advice. You know, I think part of what we showed at the third stage hearing is that his attorney, certainly Mr. Samuels, fostered an expectation on his part that he would ultimately receive a disposition. Counsel, didn't that conversation take place based on what the defendant told him the evidence was prior to him receiving the discovery and the full indictment? No, your honor. Absolutely not. Okay. Way after Mr. Gambiani had been indicted and after discovery had been exchanged, his attorney, and there was Mr. Gambiani referencing their efforts to obtain a disposition of probation, he submitted this mitigation proposal which requested an opportunity to plead guilty to a probationable offense. This was an expectation. But that was rejected by the state, right? It was. It was. And again, that's something that Mr. Samuels denied and couldn't remember doing. But absolutely it was. The record speaks for it. The package was there and it was rejected, right? Right. So this is not happening in a vacuum. This is Mr. Gambiani relying on what his attorney is telling him about what's reasonable and what he can reasonably expect about an outcome. Okay. And then, counsel, what remedy are you asking for? I will concede that the remedy part of this is not clearly spelled out in case law. But I think the strongest argument is for Mr. Gambiani's convictions to be vacated and for the plea offer to be reinstated as it was originally offered. And what authority do I have to tell the state to do this? Well, I don't know offhand. I'm more than happy to brief that. You can find that. I'd be delighted to read that case law. That's really my point. What is the remedy here? Right. So I believe that there is case law that stands for the proposition that the remedy is for the plea offer to be reinstated. There has to be a remedy if there's a constitutional violation of this magnitude. And I would suggest that that's what it is. And you're sort of glossing over that we have the authority to direct the state to make an offer that they made, I don't know, 10 years ago? Yes, Your Honor. Okay. All right. Fair enough. I have no other questions. Thank you. Thank you. Thank you, Justice Shantek. Yes, Justice Jorgensen, you get a lot of my questions, but was the defendant at arraignment fully advised of the mandatory consecutive sentences? He was not. He was not. He was given, you know, he was told that the extending range for Class X is 6 to 30 years, which in actuality for some of the offenses with which he was charged, it was actually 60 years on the maximum end. But in any event, he was only told that he was subject to 6 to 30. Okay. And you cite people versus Williams. And here in this case, isn't this a credibility issue? And I know you're saying, you know, it wasn't credible for the judge to believe what these lawyers were saying, but isn't it basically a credibility issue that we're looking at? If he found the defendant wasn't credibility and his dad wasn't credible, but the lawyers were, how do we reverse that? Because this court is not a rubber stamp for the lower court's credibility. No, you're not. And that's why we pointed out the myriad ways in which the testimony and the evidence, including the objective evidence, contradicted what it was the attorneys testified to at the third stage hearing. I would concede that, you know, it doesn't mean they're impervious to review. And this is one of those rare cases that falls at the end of the spectrum where, look, if it were a criminal defendant who was contradicted and impeached, like these attorneys were impeached, there's no way that criminal defendant would ever be deemed credible. And yet in this instance, these defense attorneys were. I mean, you have them documenting. And again, we don't even concede that what's reflected in the memo is what Mr. Gambiani was told. But setting that aside, you have a memo that was drafted five months after this that reflects that he was given the wrong advice. And he was given the wrong advice? Absolutely. Absolutely. Because that memorandum shows that he was told that consecutive sentencing was permissive, not mandatory. Well, wasn't there testimony? And I know I saw it in the brief that his father said something to the effect of, oh, you know, or he was a real estate agent or something and something to the effect that his dad was adamant not to take this plea deal that we're going to get something better coming down the pipe. This is the way it is with real estate negotiations. Didn't Halverson tell him we're never going to see this deal again? So that is so again, that is what Mr. Halverson testified to. So the question is, do you credit what it is he's saying? I don't think you should credit what he's saying, because the prosecution the day after this offer was rejected, the prosecution stated on the record that there would be no more negotiations. There's no basis other than Mr. Halverson's testimony to believe that that was the defendant and his his father's attitude towards these plea negotiations. And again, part of your job as an attorney and giving acting competently and effectively is to inform your client of the consequences of rejecting the state's offer. And here, unquestionably, that requires them to tell Mr. Gambiani that he's subject to mandatory consecutive sentencing because that alters the entire landscape of his decision making. If he doesn't know that he's subject to mandatory consecutive sentencing, then maybe it's worth it to him to see if maybe things will change and maybe there will be further negotiations. But if he's not given that advice, then he's not able to act competently and intelligently with regard to the plea offer. If the judge is believing what these lawyers say, it certainly sounds to me that the defendant had no intentions and no wish pursuant to his wishes and the advice of his dad. He had no intent to take any jail time. So don't you have to show prejudice? And how is there prejudice when it seems to me it doesn't seem unreasonable for the court to interpret the fact that this young man had no intention of taking jail time. He wanted probation. So that's based entirely on his attorney's testimony. Back to credibility. Back to credibility. But here's the other thing I will say is that one thing that is not subject to credibility that is irrefutable is that after he learned he was subject to mandatory consecutive sentencing, he was willing to take an offer of 20 years. Now, I understand that that could also be construed as the reality of the situation hitting home for him. But it's also, I would argue, pretty compelling evidence that contradicts this notion that he would just never be receptive to any prison time. After the case came back from the appellate court, they kept the same lawyers, didn't they? So he kept the same lawyers. This was not fully fleshed out, I don't think, at the third stage hearing. So he kept the same attorneys for the appeal. And there was testimony in that regard as to why. And in fact, the case was reversed. And then after it was reversed for a period of time, those attorneys remained on the case until he hired someone else to represent him. Thank you so much. I have no further questions. Mr. Curran, you have experience as a defense attorney. When is the last time the state walked up to you and said, hey, I know your client wants 20 years. We really want 30. But we're going to give him 20 because he's a good guy. I mean, it typically doesn't happen that way. So why the fact that he's now willing to accept 20 years when it's not being offered? How is that in any way relevant to what we're here about? Because it goes to his willingness to accept an offer that involves time in the penitentiary. It rebuts this notion that he was so adamant that he would never do any time in the penitentiary, which is what his lawyers testified to. And in fact, that's not true. He was, in fact, willing to accept a lengthy prison sentence after he learned that he was subject to consecutive sentencing. That happened during the course of some back and forth. There were plea negotiations before the second trial. And ultimately, the defendant, Mr. Gambiani, didn't think the offer that the state made was strong enough or made it worth the risk of him not going to trial. I don't know if I said that correctly, but hopefully you understand what I'm saying. I do. Now, how do you know what was set at arraignment since you were not trial counsel then? That's fair. My knowledge of what was set at arraignment is from the transcripts that are part of the record. I cannot find a transcript in this record of the trial. Sure. I think that the state supplemented the record with those proceedings. And Kristen can correct me on this if I'm wrong, Mrs. Friend. I'm sure you will. So I think it's correct. Let's see here. Yes, 28th of July 2008. That was the supplemental record page 14. So the minimum sentence you can get if you're convicted is six years in the DOC. The maximum is 30 years in the DOC with one year mandatory supervised release or parole. I'll review that now that you've pointed it out to me. Thank you. You know, the first time, at least as I recall the record, the first time that Mr. Samuels and the defendant met was shortly after his arrest in maybe a coffee shop somewhere. It was like the July holiday weekend or something. And they met and Mr. Gambiani told Mr. Samuels, I believe at least this is what we heard at the hearing, that, you know, this is a misunderstanding. I was just wrestling with my mind. I don't know how this will happen. And besides, my family doesn't really want me to have to go through this or him to go through this. They just want me to get treatment. And apparently Mr. Samuels had done some work because he knew that he had no prior record. Is that generally accurate about their first meeting? That is, it is accurate that that is how Mr. Samuels generally characterized their first meeting. Yes. All right. And it's at that point that the prospect of, hey, if that's the case, you know, you're going to get probation. Isn't that when this happened? I don't know for sure if it was that there was a statement that was testified to by Mr. Gambian or I apologize, his father, John Gambiani. And then Mr. Samuels agreed that there was a statement Mr. Samuels made along the lines of, oh, this kid will never do any time in prison. However, the references to probation and the efforts to get probation were ongoing long after that, for almost a year after that. If he's not going to go to prison, does that mean the case is going to be dismissed? Or does it mean that there are other options that might suffice as a sentence, like probation? Yeah. I mean, I think on its face, there's ambiguity in that statement, but I don't know that it was further fleshed out what anybody or what Mr. Samuels meant by making that statement or necessarily how it was received. All right. The discovery in this case does not happen on that first weekend after he's arrested, does it? No, I don't believe it is. So your statement was probation. I think your statement was previously probation was discussed after discovery was carefully or was carefully reviewed by Mr. Samuels. Is that correct? Well, what I'm saying is that discovery was certainly tendered by the time that the mitigation proposal was submitted in, I think it was March of 2009. So they didn't get discovery. Defense didn't get discovery for over a year after he was arrested because that's when the mitigation proposal was presented. No, Your Honor, I'm sorry if I miscommunicated. What I'm saying is certainly by the time I don't think you're miscommunicating. I think you're misstating. I could be wrong. I'm not sure I understand. So my understanding is that Mr. Samuels was well aware of the evidence against his client at the time that he submitted the mitigation proposal requesting an offer of a probational offense. Now, the other issue is, isn't it true that shortly after, well, I won't say shortly, after he reviewed the discovery, Mr. Samuels brought in Mr. Halverson because of some concern that this was a little more than he was advised of? Well, I think I don't recall that testimony off the top of my head. My recollection is that the testimony was Mr. Halverson was more local. He was close to the courthouse. He was familiar with how things work in DuPage County by virtue of him having been a former prosecutor in DuPage County. I don't know that Mr. Samuels ever testified that it was anything along the lines of more than what he could handle. All right. Now let's go to the issue of prejudice, which would be one of the elements of ineffective assistance. And in this case, there would have to be proof that he would have accepted the plea but for ineffective assistance, and we've been talking about that with some depth. The second issue is that the plea would have been entered without prosecution canceling it and with the trial court accepting it. Did you argue any of that in the trial court? No, and I think that there's no evidence in the record. Go ahead. Well, then how could you show that he was prejudiced if you at the third stage hearing did not present that evidence? Well, Your Honor, I think the normal course of events is that if the state proposes an offer and the defense accepts it, that the trial court will accept it unless there's reason on the record to believe otherwise. The Hale case is much more specific than that, isn't it? There has to be proof according to Hale. Well, Your Honor, again, unless what we're going to do is we're going to start calling judges as witnesses to testify as to whether or not they would have accepted the plea, I don't know how that's established unless there's evidence on the record to rebut what I think is a fair presumption, which is that an offer in the normal course of events that's made by the state and accepted by the defense is normally the trial court's not going to intervene and not accept the plea. I certainly think based on my own experience, that's the case. I'm not saying that it never happens, but by and large, unless there's a reason to believe on the face of the record that the court would not have accepted the plea. And I suppose if that's the ruling, then that dramatically changes how these hearings are conducted. And from here on out, we'll have to call sitting judges to testify as to, well, you know, I would have accepted the plea. I wouldn't have for these reasons. But my contention is that that is there if that requirement is there, if there's some indication on the record that for some reason the plea would have been rejected by the court. Because in the normal course of events, pleas are accepted. They're accepted all the time, routinely. Was there a 402 conference in this case prior to the trial or prior to any time actually in this first case? Let's see here. I don't believe that there was, Your Honor. Okay. That would be a good way to determine whether or not a trial court would accept the plea, wouldn't it? If a 402 conference had, in fact, occurred, yes. Now, I'm sure based upon your argument, you're familiar with the Barclays v. Florida case in 1983, although it's probably decided way before you were here. And I'm sure you're familiar with the case in which the trial judge decided that he would not accept the plea for the exercise of judgment. It is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experience. Isn't that exactly what this trial judge did here, is call upon that experience generally to, as you are calling upon your experience here to answer some of my questions, to judge the testimony of these two lawyers? No, Your Honor. Because that case and the other cases cited by the state all relate to sentencing. Those all relate to, which is a different exercise than deciding who is testifying credibly at a hearing. You know, what the trial judge did here is said, well, you know, I represented defendants and it's not a hard sell for me to believe that Mr. Gambiani, based on my experience, wanted an agreement that involved no jail time, no prison time. Well, that's not something that Mr. Gambiani, I mean, how is it relevant what these other clients of the judges in the past wanted? How is that relevant to Mr. Gambiani? And more importantly, how can he subject that to the crucible of cross-examination? I mean, how is he supposed to know going into the hearing that that's something the judge is going to rely on in rendering a credibility finding? That's not like sentencing where, you know, the judge is, and I would note, in those situations, the judge is not dipping back into his experience as either a prosecutor or defense attorney and saying, well, I'm going to sentence the person to 50 years as opposed to 40 or 30. But sentencing is inherently, it's more of a discretionary exercise, something completely different from making a credibility finding. But when he made that finding, didn't he talk about this incredibly serious case as opposed to what young Mr. Gambiani was thinking at that point? I mean, he was talking about, it doesn't make any sense to me that lawyers who had a client facing this serious case would be able to judge Mr. Gambiani's own expectations, does it? Your Honor, I think if you look at what it was he stated on the record, he was viewing the credibility of both Mr. Gambiani's testimony and the defense attorney's testimony through his own experience as a criminal defense attorney and prosecutor. All right. Thank you very much, Mr. Kern. I appreciate your answers. And you will have an opportunity to reply if you choose after Ms. Schwinn has concluded. And if you are ready, Ms. Schwinn, you may proceed. Thank you, Your Honor. May it please the Court, it would almost say good afternoon, but I think it's still good late morning. I won't go back into the procedural posture of the case. I believe opposing counsel did set forth the issue at the evidentiary hearing of the post-conviction petition. And because it was a denial of the evidence, that means that to reverse the Court's decision, the error must be clearly evident, plain, and indisputable. And here, the record does not reflect any sort of manifestly erroneous error or any error at all. You know, I think opposing counsel in his argument really set forth that, you know, he said that, you know, it's difficult in this forum, meaning in the appellate court, to assess and understand the credibility determinations. And that's exactly why the case law sets forth that it's for the circuit court to make these credibility determinations, to resolve conflicts in the evidence, to assess the credibility of the witness, to weigh each witness's determination findings, that the trial counsels for Mr. Gambiani prior to the first trial, Mr. Halverson and Mr. Samuels, was credible in testifying that they admonished or they advised the defendant of the sentencing ramifications both if he accepted the plea offer that was tendered or if he didn't accept the plea offer that was credible in testifying that his counsel did not tell him anything about the sentencing range. The court stated that, you know, he found that defendant in trying and being asked on cross-examination when he learned of the consecutive sentencing, he found that the defendant was being evasive and trying to evade answering when exactly he knew. And that is after the court had the opportunity to observe both the defendant and trial counsels testify during the evidentiary hearing. And that is exactly why the trial court is in a superior position to determine and weigh credibility when making these findings. You know, counsel points to various what he would deem alleged inconsistencies in the testimony. I believe in our brief we set forward, you know, and set forward why we don't believe those are inconsistencies or, you know, impeachment issues. I believe that both attorneys testified credibly and which is why the court gave the counsel, you know, credible, excuse me, why the court found that both Mr. Halverson and Mr. Samuels were credible in their testimony. One thing I did want to particularly point out, which was the attack on Mr. Samuels' testimony that he believed that at the time of the plea offer, there were pending child pornography charges. And I do, you know, I believe he did misspeak, but I think really it gets, it really tries to take this plea offer in a vacuum. I did supplement the record with a record from a hearing, excuse me, a hearing, a court date in January 2009, which was about six months before the plea offer had been tendered, which stated that the state notified on the record that they had information about, that they retrieved from the defendant's laptop that, oh, I'm sorry, it's not that, yeah, January 22nd, which is in supplemental record on page eight, notified on the record that we had disks of forensic analysis of the defendant's computer, which contained child pornography images and making it available to the defense counsel and indicated, we also indicated a record that at that time there had been an offer tendered and that there were ongoing pre-negotiations. So both Mr. Halverson and Mr. Samuels were aware that there were child pornography images and were aware of the fact that the state was going to be indicting with additional child pornography counts, which is what the state set forward, I believe, on July 17th, 2009, right after the denial of the plea offer, which said that we did inform that these were, these charges were coming down and were going to be indicted. And so therefore to say that Mr. Samuels had no idea that there would be child pornography charges, which is why he's incredible, is really just not looking at the record as a whole. I will say that, just turning briefly to the prejudice prompt, opposing counsel said that it was entirely the product of the attorney's testimony that Mr. Gambiani would not accept a plea offer that contained jail time. And I would just say that that is just not true from the evidentiary hearing. I will note on page 4257 of the record is when defendant's dad, John Gambiani, testified regarding his conversation with the defendant after he was told of the plea offer. His dad testified that the defendant told him, and I'm going to quote this, I'm not supposed to do any jail time. I'm not. I'm supposed to be able to get probation or whatever. I don't want to accept this. Defendant then, on direct examination during the evidentiary hearing, when asked, did you accept the offer? He says, no, I did not. When asked, and why not? Answered, because up until that point, I fully expected to receive an offer that involved some sort of probation. I think it's just, you know, it's really belying of the record to say that it's only the trial counsel's testimony that defendant only wanted to receive probation. You know, I one moment, please. You know, in terms of the other significance that defendant places on saying that he would have accepted an offer because he would have accepted 20-year offer after he had known his sentencing exposure, the defendant omits that just prior to receiving the 20-year offer, about six months prior, about five months prior, the defendant rejected a 25-year offer that he received when Mr. Samuels and Mr. Halverson still represented the defendant after the remand of the case, after it went up first time in direct If you were to look at the defendant's actions post-receiving his he still, after knowing, rejected that offer of 25 years, even knowing that he was subject to a much greater sentencing exposure. And I think that's exactly what gets to the point of the analysis, and people behail as to the prejudice problem. You know, in order to find prejudice, there must be more than a self-serving statement by the defendant that he would not have accepted it. There must be independent objective confirmation that the rejection was based on the advice and not some other considerations. And the record, as we set forth in the brief and here today, the record is replete with instances in which show that the defendant did not want to accept the plea because he did not want to serve any jail time. He only wanted a plea that included probation. And, you know, if there are no other questions, I would, the people would stand up and ask no other questions. I'm sorry, I'm so used to doing it during, in person. You know, and for those reasons, we would say that the court correctly denied the defendant's post-conviction petition. Thank you, Ms. Schwinn. Justice Jorgenson, do you have questions of Ms. Schwinn? Yeah. At the time of the arraignment, whose obligation is it to inform the defendant of consecutive sentencing? Sure. You know, Your Honor, I apologize. I did want to clarify that. The people did supplement the record, and it begins on page 12 of the supplemental record. That's not the arraignment. I don't believe the arraignment is in the record, and I don't believe he was arraigned. I believe that the defense did waive formal reading. What I did supplement was when the court. I'm sorry, I'm losing. Could you start over? Sure. I apologize. I said I did supplement the record, and it starts on page 12 in the supplemental record value. The court date, which was the first court date that the defendant appeared on, at that time, the court did admonish the defendant as to one charge, and I believe that was in discussion in case he were to not return to court. At a later date, we did indict, and I believe the record reflects my apology, I don't have the actual page number, but the record does reflect that I believe that the court there was waiving a formal reading. Okay, so here's the point. Was he ever admonished on the record about consecutive sentencing? I don't think the record reflects that the court admonished him, however, the record in terms of the testimony from the attorneys said that they did tell him. Right, I got that, but he was never admonished in court. Is that correct? I believe that is correct. Okay, and is it the better here because the defense counsel waived it? Well, I think there's a couple things. First, I believe the trial counsel waived formal reading of the charges. So, I would argue that at one point there is such a waiver of that. I believe that we did notify that we did intend to seek an extended term sentence. That was in November of 2008. I would have to go back and review. I don't see in the record where whether or not there was an extended term sentence, but that court hearing is not in the record as to what was discussed at that court hearing. So, bottom line, there's nothing in this record that would show that he was ever admonished by the court or by the state in open court that these were mandatory consecutive sentencing. Is that correct? I believe you mean prior to the guilty plea? Excuse me, prior to the sentencing hearing? Yes. Because I do believe at the sentencing hearing consecutive sentencing was discussed. Okay, but at that point the offer is long gone. So, is there anything in the record that would show the court admonished him as to mandatory consecutive sentencing prior to withdrawal of that order? Offer, excuse me, order. I would say that, well, first I would argue that the reported proceedings does not have every court date transcribed. The reported proceedings that is in the report, I do not believe has the court specifically admonishing the defendant regarding consecutive sentencing. Okay, thank you. Thanks. That was really my question. I have nothing else, Justice Hutchinson. Thank you, Justice Jorgensen. Justice Shostak, do you have any questions of Ms. Shostak? Hello? Yes, there you are. No, I have no questions. Thank you. And at this time, I do not have any questions either, Ms. Schwin. You answered the one that I had about the supplemental record. Thank you. Thank you, Your Honor. Mr. Kern, if you have any reply, you may begin at this time. Mr. Kern? I apologize. I was on mute. No problem. I apologize for that. Your best argument is on mute. Okay. Yes, there is just a couple of quick clarifying points I want to make. It is not Mr. Kern's claim that he did not want an offer that included a term only of probation or that his attorney's testimony in that regard was not truthful. His claim is that he wanted a term of probation and that his attorneys fostered an expectation that he would receive an offer that included a term of probation as evidenced by the e-mails that were introduced at the third stage hearing. There was a phone message left by Mr. Samuels on Mr. John Gambiani's answering machine that talked about how he anticipated the state would come around to, and I'm paraphrasing, but that the state would come around to a favorable offer. So the issue here is not what were Mr. Gambiani's expectations in a vacuum, but what were his expectations in light of the advice that he was given his attorneys and more specifically in light of the fact that he was not told he was subject to mandatory consecutive sentencing. Also very briefly, I know the court had asked me what precedent is there for the remedy being reinstatement of the offer. There are a couple of federal circuit court cases that have held that reinstatement of the plea offer is the remedy where you have ineffective assistance in the course of plea negotiations. One of those is United States v. Blaylock. That's a Ninth Circuit case, and the citation is 20F3rd 1458. There's another case, United States v. Allen. That's a Sixth Circuit case from 2002, 53 Fed Appendix 367. I will concede, though, again, this is not, in terms of Illinois case law, an issue that's been fully fleshed out as of yet. The last thing I'll say is that I think Mr. Schwinn made reference to me arguing previously that it's difficult in this forum to assess credibility. That's not what I was saying. What I was saying is it's difficult in the course of a 10-minute oral argument to point out all the ways in which Mr. Samuels and Mr. Halverson gave testimony that was contradictory and inconsistent with each other. That's why I would refer back to the brief that we wrote where we were able to lay that out in much greater detail. But I think this, again, is one of those rare instances in which if you really parse through the testimony at the third stage hearing, there's no way, based on the testimony of Mr. Halverson and Mr. Samuels, you can find their testimony to be credible for all the reasons we're able to lay out in greater detail in our brief. So we just ask that the lower court decision be reversed. Justice Jorgensen, do you have any questions? I have no additional questions. Thank you. Justice Shostak, do you have any questions? Yeah, one question. You never raised anywhere in your brief that the defendant wasn't properly advised by the court at any time, correct? No, because we're not attributing any faults for this situation to the court. This is entirely an ineffective assistance claim. Right. Thank you so much. Yes. Mr. Curran, didn't you in earlier argument say that at today that the trial court did advise him improperly because he didn't give him the proper maximum sentence he could receive? And then I asked you, how did you know that? And you said, good question, it's in the transcript, which we don't have. So isn't that what you said, though, that he was misinformed by the trial court? Your Honor, I apologize if I misspoke. So Mrs. Schwinn correctly pointed out that that was not a formal arraignment. That was the defendant's first time in court where he was admonished as to the range of punishment he faced for the class X felony, which was six to 30 years. And it is, you know, I wouldn't put too much emphasis on that. It's not really integral to, I think, anybody's argument. All I've done is I've pointed out that there was a change in the law effective June 1st, 2008, where his sentencing was extended from six to 30 to six to 60 years. That's all I was trying to say. The cases that you gave us about the remedy of telling the state they had to reinstate the offer, do these cases, and I admit I am not familiar with them, but were they made and accepted under like a misrepresentation or offers that were made but were never actually conveyed to the defendant and therefore the state was ordered to reoffer the plea? So in US v. Blaylock, which is the Ninth Circuit case, that one, the defendant alleged that his attorney never communicated the plea to him, the offer to him, went to trial, lost, went up on appeal. His case was reversed and as part of its order, the Ninth Circuit held that if he could establish his ineffective assistance claim, the remedy would be reinstatement of the prior plea offer. I have not had time to look at the Allen case quite as closely. But again, this just harkens, because this was not, you know, we didn't focus as much on the remedy part of this, I think, either in the Corpolo or here, because we didn't get to that point, and I'm more than happy to look more closely at that. But I just wanted to respond to, you know, your Honor's question about is there any precedent that would suggest that that would be an appropriate remedy. Okay. And this question, and it has not been briefed, but I will ask it and see if you can respond. This post-conviction petition that we're here to discuss is after two trials. One that didn't exist in the plea because it was vacated, and it relates to this plea agreement or this plea problem and the ineffective assistance of counsel. How are we now hearing it after two trials as opposed to before now? That's a really good question, Your Honor. It's an interesting legal issue. Here's what I would say. You know, this is not something that the state argued. They did not argue. So in theory, in the abstract, the state could have argued, I suppose, that by not raising this issue prior to his second trial, Mr. Gambiani waived this claim. We were prepared to argue that his subsequent trial attorney, his trial attorney for the second trial, would have been ineffective for not raising it. But it never became an issue because it was not something that the state asserted. You know, I think the thing is, though, when the case is reversed after the first set of convictions and it goes up on direct appeal and sent back, at that point, it's a continuation of the original criminal proceedings. And we have plenty of cases where the state has said, okay, well, my attorney did something pretrial that was ineffective. And we don't ever require a defendant to raise that issue, the ineffective assistance claim, prior to trial, even though it was a performance that occurred prior to trial. We don't parse through it that way. The expectation is that if there's an ineffective assistance claim, it would be brought in a post-conviction petition, especially where the evidence supporting the claim is not on the face of the appellate record. You know, I think the state could have, I suppose they could have made a latches argument. You know, they were somehow prejudiced by the defendant's failure to raise this before the second trial. But, you know, latches doesn't apply if someone's not aware that they have a cause of action or a claim for relief. And here, if Mr. Gambiani was willing to accept more than what the state's offer was, to me, that's pretty clear proof that he was not aware he had an ineffective assistance claim prior to his second trial. So I guess that's my answer to that. Hi. Thank you very much, Mr. Kern. All right. Council, thank you very much for your arguments today. We appreciate your staying with us. And we will take this matter under advisement. We will make a decision in due course. At this point, the court will stand adjourned for the day. And I will see you next time.